UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                     :
BRENNAN CENTER FOR JUSTICE AT NEW :
YORK UNIVERSITY SCHOOL OF LAW,                       :
                                                     :
                              Plaintiff,             :        16 Civ. 672 (KPF)
                                                     :
                      v.                             :        OPINION AND ORDER
                                                     :
DEPARTMENT OF HOMELAND SECURITY, :
DEPARTMENT OF JUSTICE,                               :
                                                     :
                              Defendants.            :
                                                     :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 3, 2018

KATHERINE POLK FAILLA, District Judge:

        The Brennan Center for Justice at New York University School of Law

("Plaintiff" or the "Brennan Center") brought this action under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, against the Department of Homeland

Security and the Department of Justice (collectively, the "Government" or

"Defendants"); it seeks documents regarding certain initiatives under the rubric

"Countering Violent Extremism" that were first established by the White House

in 2011. Defendants have disclosed various documents in response to

Plaintiff's FOIA claims, but the parties dispute Defendants' withholdings of a

limited set of information. Now that the parties have had an opportunity to

refine the issues, Defendants have moved for summary judgment, and Plaintiff

has cross-moved for summary judgment. For the reasons that follow,

Defendants' motion is granted in full.

**BACKGROUND**[1]

## A.    Factual Background

### 1.    The Parties

The Brennan Center for Justice at New York University School of Law is

"a non-profit, non-partisan corporation, organized under section 501(c)(3) of

the Internal Revenue Code." (Compl. ¶ 12). It describes itself as "a

nonpartisan research and policy institution … focused on fundamental issues

of democracy and justice." (*Id.*). In furtherance of that aim, the Brennan

Center's Liberty and National Security Program utilizes "policy

recommendations, litigation, and public advocacy to advance effective national

security policies," including those related to "ensuring that domestic

surveillance and counterterrorism policies are properly targeted to the threat

and do not discriminate against particular communities." (*Id.*).

This dispute concerns FOIA requests that the Brennan Center issued to

the following governmental entities: the Department of Homeland Security

("DHS"), within which Plaintiff seeks records from the DHS Office of Intelligence

---

[1]     This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), and from the
parties' submissions in relation to the instant motions. Those submissions include the
Declaration of David M. Hardy ("Hardy Decl." (Dkt. #38)); the Declaration of Arthur R.
Sepeta ("Sepeta Decl." (Dkt. #39)); the Declaration of Michael Price ("Price Decl." (Dkt.
#47)); and the Declaration of Brian J. Murphy ("Murphy Decl." (Dkt. #50)); as well as
the exhibits attached to those declarations. For ease of reference, the Court refers to
the parties' briefing as follows: Defendants' Memorandum of Law in Support of
Defendants' Motion for Summary Judgment as "Def. Br." (Dkt. #41); Plaintiff's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and
in Support of Plaintiff's Cross-Motion for Summary Judgment as "Pl. Br." (Dkt. #46);
Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for
Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary
Judgment as "Def. Reply" (Dkt. #48); and Plaintiff's Reply Brief in Further Support of
Plaintiff's Cross-Motion for Summary Judgment as "Pl. Reply" (Dkt. #51).

and Analysis ("I&A"); and the Department of Justice ("DOJ"), within which Plaintiff seeks records from the Federal Bureau of Investigation ("FBI"). (Compl. ¶¶ 13-14). The following sections detail Plaintiff's requests and Defendants' responses.

### 2. The Countering Violent Extremism Initiative

"In August 2011, President Obama issued the National Strategy for Empowering Local Partners to Prevent Violent Extremism in the United States, which outlined a strategy for the federal government to 'support and help empower American communities and their local partners in their grassroots efforts to prevent violent extremists.'" (Def. Br. 2 (citation omitted)). In December 2011, the White House issued a corresponding "Strategic Implementation Plan" (or "SIP") in furtherance of the President's efforts toward "countering violent extremism" (or "CVE"); the SIP detailed then-current CVE efforts, as well as initiatives that were to be performed by government agencies and their components, including DOJ, DHS, the U.S. Attorneys' Offices, and the FBI. (*See generally* Price Decl., Ex. 1). As framed by the Brennan Center, "CVE aims to deploy the resources of the federal government — both law enforcement and social services — to encourage and assist American Muslim communities in identifying persons who … might hold extremist views and be at risk of becoming violent." (Compl. ¶ 2).

### 3. Plaintiff's FOIA Requests

In 2014 and 2015, Plaintiff issued 13 FOIA requests to various government agencies seeking documents related to CVE initiatives. (*See*

Compl. ¶¶ 15-49). At present, a limited number of Plaintiff's requests to two government entities — the FBI and I&A — remain at issue. (*See* Pl. Br. 4-5).

### a. The FOIA Requests to the FBI

On December 23, 2014, Plaintiff submitted a FOIA request to the FBI seeking records related to the FBI's participation in CVE programs. (*See* Hardy Decl., Ex. F). On June 3, 2015, the FBI released 28 pages of documents, some of which contained redactions. (*See id.* at Ex. H; Compl. ¶ 36). On July 31, 2015, Plaintiff appealed the adequacy of the FBI's search and the redactions of the FBI's disclosed materials. (Hardy Decl., Ex. I). On November 24, 2015, the FBI remanded the FOIA request for further processing of records that had previously been withheld. (*Id.* at ¶ 22).

Also on December 23, 2014, Plaintiff submitted a second FOIA request to the FBI seeking various documents generated by the FBI's Countering Violent Extremism Office (the "CVEO"). (*See* Hardy Decl., Ex. A; Compl. ¶ 31). On January 9, 2015, the FBI acknowledged receipt of the request, and on June 3, 2015, the FBI released 25 pages of responsive documents, some of which contained redactions. (*See* Hardy Decl., Ex. B-C; Compl. ¶ 33). On July 31, 2015, Plaintiff appealed the adequacy of the FBI's search and challenged the FBI's redactions. (*See* Hardy Decl. Ex. D). The FBI denied the appeal on September 15, 2015. (Compl. ¶ 33).

On November 4, 2015, Plaintiff submitted an additional FOIA request to the FBI seeking records related to certain CVE-related activities. Among those requests, Plaintiff sought "records pertaining to the FBI's plan for 'Shared

Responsibility Committees,'" or "SRCs," which were "described as 'proposed groups of community leaders and FBI representatives who could discuss cases of specific youths.'" (Hardy Decl., Ex. K (footnote call number omitted); *see also* Pl. Br. 4). "By letter dated November 19, 2015, the FBI informed Plaintiff [that] a search of the FBI's Central Records System failed to locate any main file records responsive" to the request. (Hardy Decl. ¶ 28). On December 4, 2015, Plaintiff appealed the adequacy of the FBI's search for responsive records, which appeal the FBI denied on January 13, 2016. (*Id.* at ¶¶ 30-32).[2]

After Plaintiff filed the Complaint in this action on January 29, 2016, the FBI released additional responsive documents to Plaintiff. (*See* Hardy Decl. ¶¶ 14, 24, 33-34). On August 29, 2017, after summary judgment briefing closed, the FBI performed another search and produced additional responsive documents related to the FBI's proposals for SRCs. (*See* Dkt. #53).

In addition to a broad-based challenge to the adequacy of the FBI's search for records related to the proposed SRCs, Plaintiff offers specific challenges to the FBI's redactions to two documents: (i) the "FBI Field Office CVE Model," which "is a PowerPoint presentation that is almost entirely redacted"; and (ii) an intelligence assessment entitled *FBI Strategic Plan to Curb Violent Extremism*, which is "partially redacted." (Pl. Br. 4). In addition, from the FBI's supplemental post-briefing disclosure, Plaintiff seeks the release of three documents: (i) a July 2015 draft Memorandum of Understanding

---

[2]     The Court provides a more granular account of the FBI's search for responsive records below.

reflecting the SRC proposal as of that date; (ii) a March 2015 presentation explaining an SRC proposal; and (iii) a November 2015 executive summary of an SRC proposal. (*See* Dkt. #57).

### b. The FOIA Requests to DHS

On December 23, 2014, Plaintiff submitted two FOIA requests to DHS regarding that agency's involvement in CVE programs. (*See* Sepeta Decl. ¶¶ 10, 13). I&A acknowledged receipt of both requests by letter dated January 16, 2015. (*Id.* at ¶¶ 12, 14). After the initiation of this litigation, I&A provided records responsive to Plaintiff's FOIA request, some of which were released in full and others only in part. (*Id.* at ¶ 15).

Plaintiff challenges I&A's redactions to three intelligence assessments: (i) *Empowering Somali [redacted] Key for Countering Youth Radicalization and Their Travel Abroad for Terrorism*; (ii) *Syria-Based US and UK Persons' Public Social Media Activity Effective but Provides Terrorism Prevention Opportunities*; and (iii) *Pre-Travel Activities Exhibited by US Persons Aspiring to Fight in Syria Provide Detection Opportunities.* (Pl. Br. 5).

## B. Procedural Background

As mentioned above, Plaintiff filed its Complaint in this action on January 29, 2016. (Dkt. #1). On May 24, 2016, the Court endorsed a joint letter from the parties setting a schedule for further document processing in an attempt to resolve any remaining disputes between the parties. (Dkt. #25). The parties could not resolve their disputes fully, however, and on February 15,

2017, the Court approved a schedule for the parties to file cross-motions for summary judgment. (Dkt. #29).

On May 1, 2017, Defendants moved for summary judgment, and on June 7, 2017, Plaintiff cross-moved for summary judgment. (Dkt. #37-41, 45-50). On July 11, 2017, Defendants filed a reply memorandum of law in further support of their motion for summary judgment, and on August 11, 2017, Plaintiff filed its reply in further support of its motion for summary judgment. (Dkt. #45-51).

On September 15, 2017, Plaintiff informed the Court of the FBI's post-briefing disclosure and requested further briefing to address Plaintiff's challenges to the adequacy of that disclosure, which further briefing the Court approved that same day. (Dkt. #52-53). Accordingly, on October 13, 2017, Defendants submitted a letter brief and accompanying declaration in response to Plaintiff's September 15, 2017 letter. (Dkt. #57-58). Plaintiff submitted a letter brief in opposition on October 24, 2017. (Dkt. #59).

On February 28, 2018, the Government informed the Court that it had produced an additional set of documents to Plaintiff; the Government thus requested that Plaintiff be permitted time to review these documents and, by June 8, 2018, inform the Court whether the additional disclosure would require further briefing. (Dkt. #62). After conferring with the parties via telephone, on March 1, 2018, the Court granted the Government's request and stayed the case pending Plaintiff's review of the additional disclosure. (Dkt. #63). On June 6, 2018, Plaintiff informed the Court that no further briefing

was necessary. (Dkt. #67). The Court now lifts the stay in order to resolve the parties' motions.

## DISCUSSION

**A.    Applicable Law**

### 1.    FOIA Generally

FOIA vests federal courts with "jurisdiction to enjoin [a federal] agency from withholding agency records and to order the production of any agency records improperly withheld[.]"  5 U.S.C. § 552(a)(4)(B).[3]  The statute demands disclosure of any requested "agency records" unless they fall within one of FOIA's enumerated exemptions.  *See Grand Cent. P'ship, Inc.* v. *Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Adamowicz* v. *IRS*, 672 F. Supp. 2d 454, 460-61 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 648 (2d Cir. 2010) (summary order).  "The government bears the burden of demonstrating that an exemption applies to each item of information it seeks to withhold, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez* v. *Cent. Intelligence Agency*, 829 F.3d 178, 182 (2d Cir. 2016) (quoting *Ctr. for Constitutional Rights* v. *CIA*, 765 F.3d 161, 166 (2d Cir. 2014)).

### 2.    Resolving FOIA Claims at Summary Judgment

Summary judgment is the usual mechanism for resolving disputes under FOIA.  *See Kaye* v. *U.S. Dep't of Homeland Sec.*, No. 16 Civ. 9384 (VEC), 2018

---

[3]    The Second Circuit has explained that "jurisdiction," in this context, refers to a federal court's "remedial power, not subject-matter jurisdiction," meaning that 5 U.S.C. § 552(a)(4)(B) "does not speak to the court's ability to adjudicate a claim, but only to the remedies that the court may award." *Main St. Legal Servs., Inc.* v. *Nat'l Sec. Council*, 811 F.3d 542, 566 (2d Cir. 2016).

WL 456303, at *1 (S.D.N.Y. Jan. 17, 2018); *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017).  A district court considering a FOIA claim "may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Cuomo*, 166 F.3d at 478 (quoting *Gallant* v. *NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)); *see also Garcia* v. *U.S. Dep't of Justice, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) ("If the agency's submissions are facially adequate, summary judgment is warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply.").  "As such, where the agency's submissions are 'adequate on their face,' district courts 'may forgo discovery and award summary judgment on the basis of affidavits.'"  *N.Y. Times Co.*, 235 F. Supp. 3d at 529 (quoting *Carney* v. *U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).  Conversely, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Nat. Res. Def. Council, Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y. 2014) (quoting *N.Y. Times Co.* v. *U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007)).

**B.     Analysis**

Defendants invoke four FOIA exemptions: (i) FOIA's first exemption, covering records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" if they "are in fact properly classified" as such, 5 U.S.C. § 552(b)(1); (ii) FOIA's third exemption, covering material "specifically exempted from disclosure by statute," *id.* § 552(b)(3); (iii) FOIA's fifth exemption, covering "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," *id.* § 552(b)(5); and (iv) FOIA's seventh exemption, covering "records or information compiled for law enforcement purposes," *id.* § 552(b)(7).

The Court considers the Government's invocation of these exemptions in turn. But first, the Court considers the adequacy of the FBI's search for records related to proposals for SRCs.

**1.     The Adequacy of the FBI's Search for SRC Records**

**a.     Applicable Law**

To prevail on a summary judgment motion in a FOIA case, the defending agency bears the burden of establishing the adequacy of its search, and it may satisfy this burden by submitting "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search[.]" *Long* v. *Office of Pers. Mgmt.*, 692 F.3d 185, 190-91 (2d Cir. 2012) (quoting *Carney*, 19 F.3d at 812). "[A]gency affidavits must show that the agency made a good faith effort to search for the requested documents, using methods 'reasonably

calculated' to produce documents responsive to the FOIA request." *Seife* v. *U.S. Dep't of State*, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018) (quoting *Garcia*, 181 F. Supp. 2d at 366). "The adequacy of a search is not measured by its results, but rather by its method," and therefore, "a search is not inadequate merely because it does not identify all responsive records." *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 756 F.3d 100, 123-24 (2d Cir.), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

### b.    The Specifics of the FBI's Search

To substantiate the adequacy of its search, the FBI has submitted the declaration of David M. Hardy, the Section Chief of the Record/Information Dissemination Section within the FBI. (*See* Hardy Decl. ¶ 1). Hardy attests that upon receipt of Plaintiff's FOIA requests, the FBI searched its Central Records System ("CRS") and Sentinel for responsive records. (*Id.* at ¶ 35). He then distinguishes the two systems: CRS "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency." (*Id.* at ¶ 35 n.3). "Sentinel is the FBI's next-generation case management system that became effective FBI-wide on July 1, 2012"; after that date, "all FBI generated records [have been] created electronically in case files via Sentinel" and "indexed for future retrieval." (*Id.* at ¶ 35 n.4). The FBI determined that because of the design of these two information systems, it would be unable to locate responsive records "through

the FBI's regular search protocols based on the manner in which FBI investigative records are indexed, since the subject matter of [Plaintiff]'s request was not a named individual or victim or a common investigation subject pursued by the FBI." (*Id.* at ¶ 35).

The FBI determined that its "Office of Partner Engagement ('OPE'), Countering Violent Extremism Office ('CVEO'), was the office most likely to have records responsive" to Plaintiff's requests. (Hardy Decl. ¶ 36). It also ascertained that the SRC proposal was "reflected in a draft [Memorandum of Understanding ("MOU")], which was never finalized or adopted," and that "all FBI [SRC] records originated with the CVEO." (*Id.*). Thereafter, copies of Plaintiff's FOIA request were distributed to personnel within the CVEO, along with instructions to search paper files and electronic systems "including the CVE shared drive, email folders … and personal document folders for any and all responsive documents[.]" (*Id.* at ¶ 37). "These personnel searched for records pertaining to the 'Shared Responsibility Committee' using the following search terms: Shared Responsibility Committee, SRC, Memorandum of Understanding and MOU." (*Id.*). In addition, the Acting Section Chief of the CVEO and the Office of General Counsel searched their systems for responsive documents. (*Id.*).

After conducting these searches and identifying the employee who drafted the MOU regarding the SRC proposal, the FBI concluded that "[n]either that employee [n]or any other CVEO or other FBI personnel located any records documenting discussions or deliberations regarding" the SRC proposal that

predated the MOU.  (Hardy Decl. ¶ 38).  And although the draft MOU was withheld,[4] the FBI processed and released "several later communications regarding the draft MOU[.]"  (*Id.*).

After receiving Plaintiff's cross-motion for summary judgment, the FBI provided another declaration from Brian J. Murphy, the Section Chief of the FBI's Partner Engagement Section in the OPE, and the individual who had drafted the MOU regarding the SRC proposal.  (*See* Murphy Decl. ¶¶ 1, 6). Murphy explained that, in response to a FOIA request, the "FBI's general practice [is] to search its Central Records System to determine if the FBI has records about particular investigative subjects," but that this approach was unsuitable for Plaintiff's request because the topics it involved were "not themselves of an investigative nature."  (*Id.* at ¶¶ 3-4).  Further, "following receipt of Plaintiff's cross-motion, the FBI undertook searches of eight additional FBI offices — OPE as a whole and 7 field offices" in Los Angeles, Minneapolis, Chicago, Pittsburgh, Washington, Louisville, and Phoenix.  (*Id.* at ¶ 5).  Personnel at these offices followed the same search procedures as those applied to the initial FBI search, which resulted in the discovery of five additional responsive records that, at the time that Murphy executed the declaration, were "being processed to determine whether they [could] be released in whole or part, or whether they are exempt from disclosure under FOIA."  (*Id.*).  According to a letter from Plaintiff submitted after summary judgment briefing, as a result of this later search, "[t]he FBI produced 9 pages

---

[4]      The Court considers whether this withholding was proper below.

of material, 2 pages in full and 7 in part, and withheld 65 pages of material."
(Dkt. #53).

### c. The FBI's Search Was Adequate

The evidentiary showing provided by the FBI suffices to establish that the search it conducted was "reasonably calculated" to locate responsive documents. *Seife*, 298 F. Supp. 3d at 607. The Hardy Declaration describes the structures of CRS and Sentinel, and it explains why the FBI was not likely to locate materials responsive to Plaintiff's request in either system. This portion of the declaration sufficed to explain why the FBI did not search CRS or Sentinel for responsive documents. *See Nolen* v. *Dep't of Justice*, 146 F. Supp. 3d 89, 97 (D.D.C. 2015) ("[A] search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records." (citation omitted)).

Instead, the FBI proceeded to search both paper and electronic records within the CVEO, and the Acting Section Chief of the CVEO and the Office of General Counsel also searched their records for responsive documents. As a result, the FBI located the draft MOU reflecting the SRC proposal, as well as several communications regarding the draft MOU. The FBI also searched eight additional offices that turned up further responsive documents. In sum, the FBI's search was reasonably calculated to produce responsive documents — and was indeed effective in doing so.

In challenging the adequacy of the FBI's search, Plaintiff contends that the Hardy declaration is "insufficiently detailed in three ways[.]" (Pl. Br. 7). The Court addresses, and rejects, these arguments.

*First*, Plaintiff contends that the Hardy Declaration "does not justify limiting its search to the FBI's Central Records System ('CRS') and Sentinel databases or its failure to search those databases in a way that would be likely to discover responsive documents[.]" (Pl. Br. 7). As discussed above, the FBI did not so limit its search, but rather extended it to both paper and electronic recordkeeping systems in multiple offices. And the FBI's declarations more than suffice to allow the Court to determine "that further searches" within CRS or Sentinel "would be unreasonably burdensome," as the declarations make clear that "the structure of the agency's file system [would] make[] further search difficult." *Church of Scientology of Ca.* v. *IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986). Moreover, despite Plaintiff's contention that the FBI should have "used Boolean operators" such as "'and,' 'or,' [and] 'not'" in searching its databases (Pl. Br. 8), this was not the FBI's burden, which is only "to show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requester." *DiBacco* v. *U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) (citing *SafeCard Servs., Inc.* v. *SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)); *see also Liberation Newspaper* v. *U.S. Dep't of State*, 80 F. Supp. 3d 137, 146-47 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive

documents, the Court should not 'micro manage' the agency's search." (citing *Johnson* v. *Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002))

*Second*, Plaintiff contends that the Hardy Declaration "does not properly document how the searches were conducted" — because, for instance, it does not describe the structure of the file systems within the offices that the FBI searched. (Pl. Br. 7-9). But those file systems only included a shared drive, email folders, personal document folders, and paper files; they were not the sort of byzantine recordkeeping system that would require a more elaborate description. As provided by the case law on which Plaintiff relies, an agency need only "describe at least generally the structure of the agency's file system" to the extent that it "renders any further search unlikely to disclose additional relevant information." *El Badrawi* v. *Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 298 (D. Conn. 2008) (quoting *Katzman* v. *CIA*, 903 F. Supp. 434, 438 (E.D.N.Y. 1995)); *see also Church of Scientology*, 792 F.2d at 151 (observing that summary judgment for an agency maintaining "that further searches would be unreasonably burdensome" requires an affidavit that would "identify the searched files and describe at least generally the structure of the agency's file system which makes further search difficult"). Nor is the Court persuaded by Plaintiff's contention that the FBI's declarations should have explained why its personnel conducted the searches "without supervision." (Pl. Br. 9). Plaintiff has offered no evidence of bad faith, and the Court therefore accepts that these searches were performed as described in the declarations. *See Conti* v. *U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827 (AT), 2014 WL 1274517, at

*13-14 (S.D.N.Y. Mar. 24, 2014) (rejecting argument that agency failed to perform adequate search that was undertaken by members of the agency "at their own discretion," reasoning that "the searches [were] presumed to have been performed in good faith" (citation omitted)).

*Third*, Plaintiff's opening brief argues that the FBI has not explained why "the FBI field offices were not searched." (Pl. Br. 7). In an apparent response to this argument, the FBI searched OPE as a whole and seven field offices, and the FBI consequently located additional material, of which it disclosed a portion to Plaintiff. After the FBI produced these documents, Plaintiff did not further challenge the sufficiency of the search of these offices, despite raising other post-briefing challenges to the Government's disclosure. (*See, e.g.*, Dkt. #52 (post-briefing letter motion requesting leave for further briefing on separate issue)). Moreover, the Court will not find that this additional search somehow undermined the adequacy of the search as a whole. To the contrary, it underscores the FBI's diligence.

Accordingly, as to Plaintiff's FOIA claim challenging the adequacy of the FBI's search, the Court grants the Government's motion for summary judgment and denies Plaintiff's cross-motion for summary judgment.

### 2. The FBI's and I&A's Withholdings Pursuant to Exemption 3

The Court proceeds to consider Plaintiff's challenges to Defendants' withholdings. In redacting certain records disclosed to Plaintiff, both the FBI and I&A rely in part on FOIA's third exemption ("Exemption 3"), which allows an agency to withhold material in response to a FOIA request if the material is

(i) "specifically exempted from disclosure by [a] statute" that either (ii) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or (iii) "establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]"  5 U.S.C. § 552(b)(3).[5] Determining whether this exemption applies is straightforward, requiring the agency to show that (i) "the statute invoked qualifies as an [E]xemption 3 withholding statute," and (ii) "the materials withheld fall within that statute's scope."  *A. Michael's Piano, Inc.* v. *FTC*, 18 F.3d 138, 143 (2d Cir. 1994); *see also Am. Civil Liberties Union* v. *FBI*, No. 11 Civ. 7562 (WHP), 2015 WL 1566775, at *3 (S.D.N.Y. Mar. 31, 2015) ("In evaluating whether Exemption 3 applies, a court should 'not closely scrutinize the contents of the withheld document; instead [it should] determine only whether there is a relevant statute and whether the document falls within that statute." (alteration in original) (quoting *Krikorian* v. *Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993)).

For the qualifying statute required by the first prong of Exemption 3, both the FBI and I&A invoke Section 102A(i)(1) of the National Security Act of 1947, which reads, "[t]he Director of National Intelligence shall protect

---

[5]      The exemption also requires that the withholding statute "specifically cite to" 5 U.S.C. § 552(b)(3) if the withholding statute was "enacted after the date of enactment of the OPEN FOIA Act of 2009," which was October 28, 2009.  5 U.S.C. § 552(b)(3)(B); *see* Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009).  The withholding statutes on which the Government relies — the National Security Act and the Homeland Security Act — were both enacted before that date.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); National Security Act of 1947, Pub. L. No. 80-253, 61 Stat. 495 (1947).

intelligence sources and methods from unauthorized disclosure." 50 U.S.C.

§ 3024(i)(1). It is settled law that "[t]he National Security Act is a withholding

statute for Exemption 3 purposes." *Am. Civil Liberties Union* v. *FBI*, 59 F.

Supp. 3d 584, 594 (S.D.N.Y. 2014) (citing *Am. Civil Liberties Union* v. *Dep't of*

*Justice*, 681 F.3d 61, 72-73 (2d Cir. 2012)); *see also Elec. Privacy Info. Ctr.* v.

*Office of Dir. of Nat'l Intelligence*, 281 F. Supp. 3d 203, 212 (D.D.C. 2017).

I&A relies on an additional statute to justify its withholdings under

Exemption 3: Section 201(d)(11) of the Homeland Security Act of 2002, which

requires the Secretary of the Department of Homeland Security "[t]o ensure

that"

> (A) any material received pursuant to this chapter is protected from unauthorized disclosure and handled and used only for the performance of official duties; and
>
> (B) any intelligence information under this chapter is shared, retained, and disseminated consistent with the authority of the Director of National Intelligence to protect intelligence sources and methods under the National Security Act of 1947 and related procedures and, as appropriate, similar authorities of the Attorney General concerning sensitive law enforcement information.

6 U.S.C. § 121(d)(11).[6] Plaintiff does not appear to dispute that the Homeland

Security Act qualifies as a withholding statute under Exemption 3, and with

good reason — on its face, the Homeland Security Act specifically exempts

"intelligence sources and methods" from disclosure. *Zanoni* v. *U.S. Dep't of*

*Agric.*, 605 F. Supp. 2d 230, 236 (D.D.C. 2009) ("To determine whether a

---

[6]     A declaration submitted by the Government explains that this section of the Homeland Security Act "is unique to I&A." (Sepeta Decl. ¶ 23).

statute is a withholding statute that prohibits disclosure [under Exemption 3], the court looks at the language of the statute on its face." (citation omitted)). The Court thus assumes for purposes of the instant motion that the Homeland Security Act qualifies as an Exemption 3 withholding statute.

Stated summarily, Plaintiff's challenge is not whether the statutes qualify under Exemption 3's first prong, but whether the withheld materials qualify under Exemption 3's second prong, *i.e.*, whether "the materials withheld fall within" the scope of the statutes. *A. Michael's Piano, Inc.*, 18 F.3d at 143. Given the language of these statutes, the Court's task is to determine whether, based on the Government's submissions, "the withheld material relates to intelligence sources and methods." *Larson* v. *Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). Below, the Court first describes each agency's showing with respect to their withholdings under Exemption 3; the Court then considers the challenges that Plaintiff mounts to each agency's withholdings.

### a. The FBI's Withholdings

The FBI redacted information under Exemption 3 in only one disclosed document, the intelligence assessment entitled *FBI Strategic Plan to Curb Violent Extremism.* (*See* Def. Reply 7; Price Decl., Ex. 8, 10). In support of these redactions, the FBI relies again on the Hardy Declaration. Hardy explains that the information withheld in these redactions includes "violent extremist threat evaluation techniques, threat prioritization methods, methods for identifying violent extremists, and intelligence collection methods used by the FBI in the context of foreign counter-terrorism investigations or operations,

and information that would disclose the intelligence gathering priorities of the FBI as they relate to CVE efforts." (Hardy Decl. ¶ 53).

### b. I&A's Withholdings

I&A also redacted information under Exemption 3 from each of three intelligence assessments: (i) *Pre-Travel Activities Exhibited by US Persons Aspiring to Fight in Syria Provide Detection Opportunities*; (ii) *Empowering Somali [redacted] Key for Countering Youth Radicalization and Their Travel Abroad for Terrorism*; and (iii) *Syria-Based US and UK Persons' Public Social Media Activity Effective but Provides Terrorism Prevention Opportunities*. (Sepeta Decl. ¶¶ 17-19). To support its withholdings, I&A offers the declaration of Arthur R. Sepeta, Chief of the Privacy and Intelligence Oversight Branch of I&A. (*Id.* at ¶ 1). Sepeta attests that the redactions were justified to protect "intelligence sources and methods" for the following reasons:

> The redacted material is intelligence information that I&A acquired, developed, and utilized consistent with its authorities under the Homeland Security Act, ... and as a member of the Intelligence Community, as contemplated by [the National Security Act]. First, the redactions applied in the documents at issue protect the underlying sources of intelligence that I&A relied upon to form its analytical assessments and draft each intelligence product. Second, the redactions protect information that would reveal the Intelligence Community's methods, namely its allocation of resources, determination of targets, and tactics in countering violent extremists, including how these inform analytical insights. This includes, for example, information that would reveal vulnerabilities in intelligence methods for collection, prioritization, and resource allocation that may be exploited by the Islamic State of Iraq and al-Sham (ISIS) and other terrorist organizations to promote radicalization, common indicators displayed by those radicalizing that may be

used in identifying homegrown violent extremists, identification and assessment of the effectiveness of tools and tactics used by ISIS in recruitment, particular subjects of interest to the federal government, and counterterrorism mitigation strategies. The remaining information redacted per Exemption 3 addresses intelligence production methods, such as methods for intelligence collection and analyst evaluations of confidence in their assessments.

(*Id.* at ¶ 25).

### c. The FBI's and I&A's Withholdings Pursuant to Exemption 3 Were Proper

In challenging the FBI's and I&A's withholdings under Exemption 3, Plaintiff makes the sweeping assertion that because the Government "claims that CVE is not an intelligence gathering or law enforcement program," *any* documents created by Defendants in relation to CVE "cannot logically relate to intelligence sources and methods." (Pl. Br. 12; *see also id.* at 13 ("DHS has specifically and unequivocally asserted that CVE is not related to intelligence gathering, so the withheld information does not 'logically' or 'plausibly' relate to intelligence sources and methods.")). Plaintiff's position is facially appealing, as certain Government-generated documents in the record emphasize that CVE efforts are designed to further community engagement, awareness, and the intervention of terrorism, rather than to gather evidence that the Government may later wield in a particular investigation or prosecution. (*See, e.g.*, Price Decl., Ex. 2 (Exec. Office of the President of the U.S., *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States* 2 (2016) ("The term 'countering violent extremism,' or CVE, refers to proactive actions to counter efforts by extremists to recruit, radicalize, and

mobilize followers to violence. … CVE efforts do not include gathering intelligence or performing investigations for the purpose of criminal prosecution.")); *id.* at Ex. 3 (U.S. Gov't Accountability Off., GAO-17-300, *Countering Violent Extremism, Actions Needed to Define Strategy and Assess Progress of Federal Efforts* 7 (2017) (describing CVE as "[c]ommunity engagement and counseling to prevent radicalization to violence," as opposed to "Counterterrorism," which is described as "[c]ollecting evidence and making arrests before an event has occurred")); *id.* at Ex. 4 (U.S. Dep't of Homeland Sec., *Strategy for Countering Violent Extremism* 2 (2016) ("Intelligence and law enforcement investigations are not part of CVE activities[.]")).

But these statements do not mean that the FBI and I&A do not, as a factual matter, maintain records that relate to intelligence sources and methods while also containing information regarding CVE initiatives. Indeed, it would be naiveté to presume that such documents would not exist, given the focus on national security. Moreover, much of Plaintiff's argument on this point devolves to speculation concerning the underlying source of the information contained in the redacted documents. (*See, e.g.*, Pl. Br. 13 (stating that one of I&A's documents "obviously relies on information gathered through CVE initiatives")). But the record contains nothing confirming such speculation, and even if it did, this would not eliminate the "substantial weight and due consideration" owed to Government affidavits dealing with intelligence sources or methods. *Fitzgibbon* v. *CIA*, 911 F.2d 755, 762 (D.C. Cir. 1990). Accordingly, Plaintiff's motion for summary judgment as to both the FBI's and

I&A's reliance on Exemption 3 is denied, and Defendants' correlative motion is granted.

### 3. The FBI's Withholdings Pursuant to Exemption 1

#### a. Applicable Law

FOIA's first exemption ("Exemption 1") shields from disclosure matters that are (i) "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy," and (ii) "in fact properly classified pursuant to such Executive [O]rder[.]" 5 U.S.C. § 552(b)(1). Executive Order 13,526, in turn, authorizes categorizing information as "classified" if (i) "an original classification authority is classifying the information"; (ii) "the information is owned by, produced by or for, or is under the control of the United States Government"; (iii) "the information falls within one or more of" certain enumerated categories, including "intelligence sources or methods"; and (iv) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage." 75 Fed. Reg. 707 (Dec. 29, 2009).

#### b. The FBI's Withholdings

The FBI invoked Exemption 1 in redacting information from one document issued by the CVEO, entitled *FBI Strategic Plan to Curb Violent Extremism.* (Price Decl. Ex. 8; Def. Reply 7). The Hardy Declaration explains the procedural steps that Hardy carried out in classifying pieces of the

document as confidential, including marking each document as classified,

clearly indicating which portions were classified and which were exempt from

declassification, and declassifying any "reasonably segregable portion" of the

documents "that did not meet the standards for classification[.]" (Hardy Decl.

¶ 47). Hardy also explains that the redacted information "pertains to …

intelligence sources or methods" for the same reasons proffered for the FBI's

redactions under Exemption 3. (*Id.* at ¶ 48). To satisfy Executive

Order 13,526's final requirement of a reasonable expectation of damage to

national security as a consequence of disclosure, Hardy states that disclosure

of the redacted information could offer

> adversaries … valuable insight into the FBI's methods
> for gathering, evaluating, and acting upon intelligence
> concerning violent extremists. Armed with this
> information, adversaries could extrapolate and apply
> these insights to predict the FBI's intelligence gathering
> strategies and investigative responses, and develop
> countermeasures to avoid detection and/or disruption
> by the FBI.

(*Id.* at ¶ 53).

### c. The FBI's Withholdings Pursuant to Exemption 1 Were Proper

Plaintiff challenges the FBI's redactions under Exemption 1 on several

grounds. At the outset, Plaintiff repeats the argument that the FBI may not

categorize the information in these documents as relating to intelligence

sources and methods in light of their relation to CVE efforts. (Pl. Br. 15). That

argument fails for the same reasons provided in the Court's analysis of

Exemption 3.

Plaintiff then raises a number of arguments based on the procedural requirements of categorizing a document as confidential under Executive Order 13,526. *First*, Plaintiff argues that the FBI has not established whether the document was classified before or after receiving the FOIA request at issue; in the latter case, the FBI would have had to follow additional procedures to protect the documents from disclosure. (*See* Pl. Br. 15-16 (citing *Judicial Watch, Inc.* v. *U.S. Dep't of Def.*, 715 F.3d 937, 943 (D.C. Cir. 2013) ("[P]reviously undisclosed information may be classified after an agency has received a FOIA request [under Executive Order 13,526] 'only if such classification … is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, deputy agency head, or the senior agency official designated under [a section of] this order.'" (first alteration added)))). Yet nothing in the record suggests that the documents at issue were only classified as confidential after receipt of Plaintiff's FOIA request. Indeed, Hardy's Declaration — for which there is neither contradictory evidence nor showing of bad faith — suggests just the opposite. (*See* Hardy Decl., ¶ 48 (stating that, after reviewing the information withheld under Exemption 1 in response to Plaintiff's FOIA request, Hardy "determined the classified information *continue[d]* to warrant classification at the 'Secret' level" (emphasis added)). The declaration further states that Hardy "made certain that all procedural requirements … were followed in order to ensure that the information was properly classified," including that "each document was marked as required and stamped with the proper classification

designation[.]" (Hardy Decl. ¶ 47). And as the Government points out (Def. Reply 8), these markings are apparent on the documents themselves (*see* Price Decl. Ex. 8 (showing markings at top of each page reading "SECRET//NOFORN" and "FBI INTERNAL USE ONLY" that were stricken through, presumably after reviewing for production)). This challenge thus fails.

*Second*, Plaintiff argues that the declaration does not make clear that Hardy possesses the proper credentials to categorize a document as classified under § 1.7(d) of Executive Order 13,526 (*see* Pl. Br. 16), which requires the "personal participation or … the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4" of the Executive Order. However, § 1.7(d) only applies where information is classified as confidential *in response to* a FOIA request, which, as discussed above, is not the case here. By contrast, § 1.1 of the Executive Order only requires that "an original classification authority is classifying the information," and § 1.3 provides that such authority "may be exercised" by persons including "[o]fficials authorized to classify information at a specified level[.]" Hardy's declaration makes clear that he was "designated by the Attorney General of the United States as an original classification authority … pursuant to Executive Order 13[,]526 §[] 1.3." (Hardy Decl. ¶ 2). Thus, based on the Hardy Declaration, the FBI properly classified the document at issue and the FBI was entitled to rely on Exemption 1 in redacting portions of the *FBI Strategic Plan to Curb Violent Extremism*.

#### 4. The FBI's and I&A's Withholdings Pursuant to Exemptions 1 and 3 Are Not Invalid on Account of Prior Official Disclosure

As a fallback position, Plaintiff argues that the information withheld under Exemptions 1 and 3 has been publicly disclosed previously and thus is not entitled to protection under those exemptions.  (Pl. Br. 16).  And the law is clear that Exemptions 1 and 3 "may not be invoked to prevent public disclosure when the government has *officially* disclosed the *specific* information being sought."  *Hudson River Sloop Clearwater, Inc.* v. *Dep't of Navy*, 891 F.2d 414, 421 (2d Cir. 1989).  Such information "is deemed to have been officially disclosed if it" (i) "is as specific as the information previously released," (ii) "matches the information previously disclosed," and (iii) "was made public through an official and documented disclosure."  *Wilson* v. *CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (alterations and citation omitted).

Plaintiff contends that information withheld by both the FBI and I&A under Exemptions 1 and 3 has been previously disclosed to the public:  For I&A, this information consists of "common indicators displayed by those radicalizing that may be used in identifying homegrown violent extremists," and for the FBI, this information is that contained in the FBI Field Office CVE Model presentation.  (Pl. Br. 16-17 (quoting Sepeta Decl. ¶ 25)).  As evidence that I&A's "common indicators" of radicalization were disclosed, Plaintiff points to portions of the record indicating that CVE efforts included educating members of the public about signs of potential radicalization.  (Pl. Br. 16-17 (quoting Price Decl. Ex. 8, 19)).  And to show that the FBI Field Office CVE Model was officially disclosed, Plaintiff relies on (i) Hardy's statement that the

document "contains proposed CVE program components to be utilized in FBI Field Offices," and (ii) Plaintiff's assertion that "the public-facing role of field offices in the CVE program is well documented." (*Id.* at 17 (quoting Hardy Decl. ¶ 24)).

These arguments also miss the mark. To begin, nothing in the record suggests that any information released to members of the public who were CVE participants was "as specific as the information" contained in the records at issue. *Hudson River*, 891 F.2d at 421. Moreover, even if the record demonstrated comparable specificity, the disclosure would only be to a small segment of the public, insufficient to render the disclosure "public in the sense relevant to the official disclosure doctrine." In other words, the information never became "a matter of public record that could be easily discoverable by any interested member of the public." *Wilson*, 586 F.3d at 188 (internal quotation marks and alterations omitted) (quoting *Hudson River*, 891 F.3d at 422).

### 5. The FBI's Withholdings Pursuant to Exemption 5

#### a. Applicable Law

FOIA's fifth exemption ("Exemption 5") shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). "Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure," including the privilege on which the FBI now relies in shielding its documents from disclosure, the deliberative

process privilege.  *Am. Civil Liberties Union* v. *U.S. Dep't of Justice*, 210 F. Supp. 3d 467, 476 (S.D.N.Y. 2016) (quoting *Nat'l Council of La Raza* v. *Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005)).

"The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza*, 411 F.3d at 356.  The privilege is "a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue* v. *U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (internal alterations, quotation marks, and citations omitted).  For the privilege to apply to a document, the document must be (i) "predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision," and (ii) "deliberative, *i.e.*, actually related to the process by which policies are formulated." *Nat'l Council of La Raza*, 411 F.3d at 356 (internal alterations, quotation marks, and citations omitted).

"To find that a document is predecisional, [a] court must be able 'to pinpoint an agency decision or policy to which the document contributed,' or was intended to contribute." *Heartland All. for Human Needs & Human Rights* v. *U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018) (quoting *Senate of the Commonwealth of Puerto Rico* v. *DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987)).  "Examples of the type of documents that might qualify as predecisional are 'recommendations, draft documents, proposals, suggestions,

and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Wilderness Soc.* v. *U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 11 (D.D.C. 2004) (quoting *Coastal States Gas Corp.* v. *Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

As to the second prong, "[a] document is deliberative if 'the materials ... bear on the formulation or exercise of agency policy-oriented *judgment.*'" *Wilderness Soc.*, 344 F. Supp. 2d at 11 (quoting *Petroleum Info. Corp.* v. *Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)). In other words, the document must "reflect[] the give-and-take of the consultative process," *Judicial Watch, Inc.* v. *FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Costal Gas*, 617 F.2d at 866), and have been "generated as part of a definable decision-making process," *Heartland All. for Human Needs*, 291 F. Supp. 3d at 80 (D.D.C. 2018) (citation omitted). This standard generally requires the agency to explain (i) "the nature of the specific deliberative process involved," (ii) "the function and significance of the documents in that process," and (iii) "the nature of the decisionmaking authority vested in the document's author and recipient." *Id.* (quoting *Nat'l Sec. Counselors* v. *CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)).

### b.     The FBI's Withholdings

The FBI relied on Exemption 5 to withhold, either in whole or in part, two documents "compiled during the developmental stages of the CVE programs": (i) the "content of a PowerPoint presentation of a draft FBI CVE Program Model that was being developed for potential use in the FBI field Offices" (the

"PowerPoint Presentation"), and (ii) information from three pages of the *FBI Strategic Plan to Curb Violent Extremism*. (Def. Br. 19 (quoting Hardy Decl. ¶¶ 60-64)). The FBI completely withheld the contents of the PowerPoint Presentation, asserting that it "was drafted during the preliminary developmental stages of the CVE program" and "does not reflect a final decision regarding the content of the FBI CVE Program Model, let alone a final decision regarding any actual CVE programs." (Hardy Decl. ¶ 62).

After summary judgment briefing closed, the FBI made a supplemental document production in which it redacted three documents under the deliberative process privilege: (i) "a July 2015 draft of a Memorandum of Understanding reflecting the SRC proposal as of that date (the 'Draft MOU')"; (ii) "a March 2015 presentation setting out an SRC proposal ('SRC Proposal Presentation')"; and (iii) "a November 2015 executive summary of an SRC proposal ('SRC Proposal Executive [S]ummary')." (Dkt. #57). Plaintiff challenged certain withholdings of these documents, which withholdings Defendants maintain were warranted as concerning "never-finalized and never-adopted iterations of a proposal within the [FBI] for the formation and operation of [SRCs]." (*Id.*).

To support its positions, the Government submitted a supplemental declaration from David Hardy (the "Supplemental Hardy Declaration"). (*See* Dkt. #58 ("Supp. Hardy Decl.")). With particular respect to the *FBI Strategic Plan to Curb Violent Extremism*, the FBI redacted portions of three pages relating to the following FBI effort:

a special interest group (SIG) that the CVEO established on the Law Enforcement Online (LEO) portal. The LEO portal is a portal that allows federal, local, and State law enforcement agencies to interact and coordinate. The SIG is a group on that portal that was created to provide exposure to the CVE mission and initiatives and facilitate communications regarding CVE issues within the law enforcement community. The withheld deliberative material is progress reporting on and proposals for the construction of the SIG site and draft communication strategies. The withheld information consists of pre-decisional, deliberative progress reviews — consisting of preliminary opinions, recommendations, evaluations, and comments — written by CVEO personnel as they worked to develop the SIG and CVEO communication strategies.

(Hardy Decl. ¶ 63).

### c. The FBI's Withholdings Pursuant to Exemption 5 Were Proper, Except for the PowerPoint Presentation

The Hardy Declarations at issue present an exercise in contrast. Although they suffice to justify the FBI's redactions to the *FBI Strategic Plan to Curb Violent Extremism* and to the documents regarding the 2015 SRC proposals, they fail to satisfy the requirements of the deliberative process privilege as to the PowerPoint Presentation.

Considering first the redactions to the *FBI Strategic Plan to Curb Violent Extremism*, the Hardy Declaration establishes that the information withheld was predecisional. The Court is able to "pinpoint [the] agency decision or policy to which the document contributed," namely, the special interest group that the CVEO established on its online portal. *Heartland All. for Human Needs*, 291 F. Supp. 3d at 79. And the Declaration makes clear that the information at issue — "consisting of preliminary opinions, recommendations,

evaluations, and comments" — is of the sort properly considered predecisional. *Wilderness Soc.*, 344 F. Supp. 2d at 11. The Court also finds the redacted material to be deliberative, in that it was "progress reporting on and proposals for the construction of the SIG site and draft communication strategies." This type of intra-agency communication reflects "participat[ion] in the exchange of ideas that have not yet been finalized into a policy that may or may not ultimately be adopted as policy." *Soghoian* v. *Office of Mgmt. & Budget*, 932 F. Supp. 2d 167, 182 (D.D.C. 2013).

The FBI also offers sufficiently detailed accounts of the roles that the Draft MOU, SRC Proposal Presentation, and SRC Proposal Executive Summary played in its 2015 SRC proposals. The Supplemental Hardy Declaration relates that the Draft MOU, which "was never finalized or used," was "drafted to be entered by the FBI and SRC members," and "sets out a proposal concerning the FBI's interaction with SRCs and reflects the SRC proposal as it existed in July 2015." (Supp. Hardy Decl. ¶ 7). The "Draft MOU was reviewed and approved by the … FBI's Office of General Counsel," which was "comfortable with respect to the legal consequences" of the Draft MOU, but this was only one step in "a multi-layer review and approval process before formal adoption and implementation." (*Id.* at ¶ 8).

The Supplemental Declaration also provides that the SRC Proposal Presentation consisted of a "March 2015 FBI presentation for the FBI's Chicago Field Office that sets out features of the SRC proposal," which was "comprised of pre-decisional, deliberative information setting out features of the SRC

proposal at that point in time." (Supp. Hardy Decl. ¶ 13). As to the SRC Proposal Executive Summary, Hardy explains that the document "is an internal, pre-decisional document," a "summary of an SRC proposal [that] was reviewed and approved by the FBI [Office of General Counsel]." (*Id.* at ¶¶ 16-17). The Supplemental Hardy Declaration is thus sufficiently detailed to allow the Court to conclude that the three documents regarding the 2015 SRC Proposals were both predecisional and deliberative.

Conversely, the Court is unable to find the same as to the PowerPoint Presentation, the contents of which were entirely withheld. The Hardy Declaration merely recites the fact that the PowerPoint "was drafted during the preliminary developmental stages of the CVE program" and "does not reflect a final decision regarding the content of the FBI CVE Program Model[.]" (Hardy Decl. ¶ 62). This vague and conclusory assertion allows neither the Court nor Plaintiff to assess whether the information withheld is predecisional or deliberative. *See Heartland All. for Human Needs*, 291 F. Supp. 3d at 79 (denying deliberative process protection where agency "merely noted for each section of the [withheld] draft statistical reports that the draft reports 'were part of a continuing process of revisions generated in advance of the adoption of a final [agency] policy'" (emphasis removed)); *Heffernan* v. *Azar*, No. 15 Civ. 2194 (RBW), 2018 WL 3150214, at *20-21 (D.D.C. June 27, 2018) (holding that descriptions of withheld information in draft press release were too "broad and vague" to "assist the [c]ourt in any meaningful manner," where they were "masked with discussions of the draft press releases as a whole").

In defending the FBI's decision to redact the contents of the PowerPoint Presentation, the Government argues that doing so was permissible under Exemption 5 simply because the PowerPoint Presentation is a draft. (*See* Def. Reply 22 ("Because it is a draft, the draft CVE Program Model … is protected from disclosure under Exemption 5.")). But courts have "made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." *Wilderness Soc.*, 344 F. Supp. 2d at 14 (citing *Arthur Andersen & Co.* v. *IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)). The FBI's rationale for withholding the contents of the PowerPoint Presentation pursuant to Exemption 5 is thus insufficient, as it fails to detail "the nature of the specific deliberative process involved," "the function and significance of the [PowerPoint Presentation] in that process," and "the nature and decisionmaking authority vested in the [PowerPoint Presentation]'s author and recipient." *Heartland All. for Human Needs*, 291 F. Supp. 3d at 80-81.

Given the foregoing, the FBI's withholdings pursuant to Exemption 5 are proper insofar as they concern the *FBI Strategic Plan to Curb Violent Extremism*, Draft MOU, SRC Proposal Presentation, and SRC Proposal Executive Summary, but not proper as applied to the PowerPoint Presentation. Significantly, however, the FBI also based its withholding of the contents of the PowerPoint Presentation on FOIA's seventh exemption (*see* Price Decl., Ex. 10), and as discussed in the following section, that alternative basis is valid.

### 6.    The FBI's and I&A's Withholdings Pursuant to Exemption 7

Both the FBI and I&A rely on FOIA's seventh exemption ("Exemption 7")
in redacting certain information from their respective disclosures.  "Exemption
7 applies generally to 'records or information compiled for law enforcement
purposes'" if "production of the information might be expected to produce one
of six specified harms."  *Keys* v. *U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C.
Cir. 1987) (quoting 5 U.S.C. § 552(b)(7), and citing *id.* § 552(b)(7)(A)-(F)).[7]
Covered information includes (i) as I&A purports to withhold, information that
"could reasonably be expected to disclose the identity of a confidential source"
and "information furnished by" that source, *id.* § 552(b)(7)(D); and (ii) as both
the FBI and I&A purport to withhold, information that "would disclose
techniques and procedures for law enforcement investigations or prosecutions,
or would disclose guidelines for law enforcement investigations or prosecutions

---

[7]    The specified harms include situations in which production of the law enforcement
materials:

> (A) could reasonably be expected to interfere with enforcement
> proceedings, (B) would deprive a person of a right to a fair trial or
> an impartial adjudication, (C) could reasonably be expected to
> constitute an unwarranted invasion of personal privacy, (D) could
> reasonably be expected to disclose the identity of a confidential
> source, including a State, local, or foreign agency or authority or
> any private institution which furnished information on a
> confidential basis, and, in the case of a record or information
> compiled by criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national
> security intelligence investigation, information furnished by a
> confidential source, (E) would disclose techniques and procedures
> for law enforcement investigations or prosecutions, or would
> disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to
> risk circumvention of the law, or (F) could reasonably be expected
> to endanger the life or physical safety of any individual[.]

5 U.S.C. § 552(b)(7)(A)-(F).

if such disclosure could reasonably be expected to risk circumvention of the law," *id.* § 552(b)(7)(E).

The FBI applied Exemption 7 to redact the following information: (i) "sensitive internal FBI terminology, definitions, processes, strategic developmental planning and implementation mechanisms, research, and training for CVE program initiatives unknown to the general public, and developed to counter violent extremism"; (ii) "sensitive file numbers or sub-file names"; (iii) "identity and/or location of FBI coordinating joint units, squads, [and] divisions"; and (iv) "details pertaining to coordination of FBI's limited resources for effective strategic CVE programming and planning[.]"  (Hardy Decl. ¶ 42 (capitalization removed)).  I&A applied Exemption 7 to withhold (i) "the identity of a confidential source for I&A's national security intelligence investigation involving Syria-based and Syria-bound violent extremists and the information that source provided"; and (ii) "information that would disclose techniques, procedures, and guidelines for national security investigations to counter violent extremism."  (Sepeta Decl. ¶¶ 30, 32).

### a. Both the FBI and I&A Satisfied Exemption 7's Threshold Requirement

Invoking Exemption 7 requires a threshold showing "that the materials be 'records or information compiled for law enforcement purposes.'"  *John Doe Agency* v. *John Doe Corp.*, 493 U.S. 146, 148 (1989).  Plaintiff argues that both the FBI and I&A failed to satisfy this threshold showing, echoing its challenge to the agencies' withholdings under Exemptions 1 and 3.  Specifically, Plaintiff contends that the documents involved relate to CVE efforts, "which the

government has repeatedly claimed is not a law enforcement" initiative. (Pl. Br. 19-20). As in the context of Exceptions 1 and 3, this argument is unpersuasive.

To show that particular documents qualify as "records or information compiled for law enforcement purposes," an agency must establish a rational nexus between the agency's activity in compiling the documents and "its law enforcement duties." *Keys*, 830 F.2d at 340 (discussing *Pratt* v. *Webster*, 673 F.2d 408, 419-21 (D.C. Cir. 1982)). "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of law." *Pub. Emps. for Envtl. Responsibility* v. *U.S. Section, Int'l Boundary & Water Comm'n, U.S.- Mex.*, 740 F.3d 195, 203 (D.C. Cir. 2014). Rather, "the 'ordinary understanding of law enforcement includes ... proactive steps designed to prevent criminal activity and to maintain security,'" and, as relevant here, "steps by law enforcement officers to prevent terrorism surely fulfill 'law enforcement purposes.'" *Id.* (quoting *Milner* v. *Dep't of the Navy*, 562 U.S. 562, 583 (2011) (Alito, J., concurring)). From this premise, it follows *a fortiori* that information may hold a rational nexus to law enforcement even though it does not relate to a particular investigation or prosecution. *See, e.g.*, *Tax Analysts* v. *I.R.S.*, 294 F.3d 71, 79 (D.C. Cir. 2002) ("It is clear that, under ... Exemption 7, an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation."); *Keys*, 830 F.2d at 342

("There is … no requirement under [E]xemption 7 that any violation of federal law be implicated[.]").

The declarations submitted by both the FBI and I&A establish that the records withheld pursuant to Exemption 7 bear a rational nexus to law enforcement purposes. As for the FBI, the Hardy Declaration provides as follows:

> The Pertinent records were compiled and/or created during the FBI's efforts to initiate the CVE program. The FBI's CVE program serves the FBI's mission of providing assistance to and engaging with international, federal, state and local law enforcement with respect to counterterrorism and other law enforcement efforts. … As relevant here, the FBI's CVEO was established to leverage resources and join with federal counterparts to empower our state, local and tribal partners in order to mitigate violent extremists and their supporters from inspiring, radicalizing, financing, or recruiting individuals or groups in the United States to commit acts of violence.

(Hardy Decl. ¶ 66). The Sepeta Declaration similarly clarifies that the information withheld by I&A pursuant to Exemption 7 is related to law enforcement purposes because it concerns a source that "provided information on social media use to assist counterterrorism and law enforcement officials in understanding the threat posed by Syria-based foreign fighters and US-based extremists," as well as information regarding "techniques, procedures, and guidelines for identifying individuals who have provided or are planning to provide material support to terrorists in Syria and Iraq and tactics of those individuals[.]" (Sepeta Decl. ¶¶ 30, 32).

Thus, the considerations identified in the Sepeta and Hardy Declarations more than suffice to satisfy Exemption 7's threshold requirement. *See, e.g.*, *Elec. Privacy Info. Ctr.* v. *U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 523 (D.C. Cir. 2015) (holding document satisfied threshold requirement where it was developed after 2005 bombings in London "to address deficiencies in the United States' ability to address and respond to such threats"); *Pub. Employees for Envtl. Responsibility*, 740 F.3d at 204 (holding documents satisfied threshold showing where they described security precautions to be implemented by law enforcement personnel around dams during emergency conditions).

### b. The FBI's and I&A's Withholdings Pursuant to Exemption 7(E) Were Proper

Plaintiff's arguments as to the FBI's and I&A's invocation of Exemption 7(E) echo its arguments with respect to the exemption's threshold showing, and fail for similar reasons. As mentioned above, Exemption 7(E) shields from disclosure information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E). Whereas "guidelines" generally consist of "an indication or outline for future policy or conduct," which in the context of Exemption 7(E) refers to "resource allocation," the terms "techniques and procedures ... refers to how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project* v. *Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

(1986)). "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Blackwell* v. *FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown LLP* v. *IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).

### i.    The FBI's Exemption 7(E) Withholdings

With respect to the FBI's four categories of withholdings under Exemption 7(E), Hardy explains that disclosure of (i) the redacted "internal FBI terminology, definitions, procedures, and strategic developmental planning and implementation mechanisms, research, and training for CVE program initiatives that the FBI has developed" "would reveal the scope and focus of the FBI's CVE program and the strategies it plans to pursue in preventing and disrupting potential violent criminal activities"; (ii) "sensitive case file numbers … would not only disclose investigative techniques and procedures, but also would disclose investigative resources allocation and/or FBI investigative strategies, thus revealing guidelines for law enforcement investigations"; (iii) "the location and identity of FBI units and/or joint units that were involved in a particular investigation" would allow investigative targets "to adjust their behaviors and activities to avoid detection/disruption by the FBI and continue to circumvent the law"; and (iv) "strategic resource allocation efforts needed to implement the FBI's CVE Program" "would reveal

the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts, thus revealing guidelines for law enforcement investigations." (Hardy Decl. ¶¶ 70-73).

These averments "demonstrate logically how the release of the requested information might create a risk of circumvention of the law," and Plaintiff's contestations to the contrary are unpersuasive. *Blackwell*, 646 F.3d at 42. Plaintiff argues that these withholdings, insofar as they relate to the CVE program, "are not 'law enforcement' programs and they do not relate to a specific investigation or prosecution." (Pl. Br. 21). But Exemption 7(E) does not require withheld materials to be related to such a particular investigation or prosecution. *See Tax Analysts*, 294 F.3d at 79.

Plaintiff also contends that the information withheld is neither "techniques and procedures" nor "guidelines." (Pl. Br. 21). Yet the FBI's first and fourth categories of withholdings listed above — respectively, "internal FBI terminology, definitions, procedures, and strategic developmental planning and implementation mechanisms, research, and training for CVE program initiatives" and "strategic resource allocation efforts needed to implement the FBI's CVE program" — each involve "an indication or outline of future policy or conduct" and "resource allocation," and they therefore qualify as law enforcement "guidelines." *Allard K. Lowenstein*, 626 F.3d at 682. The second and third categories listed above — respectively, "sensitive case file numbers" and "the location and identity of FBI units and/or joint units that were involved in a particular investigation" — address how the FBI "go[es] about investigating

a crime," and they therefore qualify as law enforcement "techniques and procedures." *Id.*

The Court thus sees no reason to look behind the FBI's representation that the release of the withheld material would risk circumvention of law, and concludes instead that the FBI's withholdings under Exemption 7(E) meet the "relatively low bar" applicable to this exemption. *Blackwell*, 646 F.3d at 42.

### ii.    I&A's Exemption 7(E) Withholdings

Under Exemption 7(E), I&A withheld information regarding

> indicators that an individual may be radicalizing and planning to fight overseas with ISIS or otherwise provide material support to ISIS, categories of individuals that I&A has identified as at risk for radicalization and common characteristics they share, and the factors that I&A has identified as contributing to that radicalization.

(Sepeta Decl. ¶ 32). I&A has identified a host of deleterious consequences that could flow from disclosing this information: (i) it could allow "individuals engaged or planning to engage in terrorism … to circumvent the law by avoiding certain identification strategies and tactics"; (ii) "it would reveal I&A's threat prioritization and resource allocation and would inform violent extremists of the government's investigative strategies and tactics to detect, monitor, and counter the work of terrorist organizations"; and (iii) it would "reveal techniques and procedures, including the types and sources of information, and manner of selecting, obtaining, and vetting and evaluating that information," which "would compromise I&A's intelligence investigation techniques and procedures by revealing I&A's source selection method[.]" (*Id.* at ¶¶ 32-34).

Plaintiff contends that "the intelligence assessments at issue here are part of the CVE program and as such do not relate to 'law enforcement investigations or prosecutions.'" (Pl. Br. 22). But this is simply another attack on Exemption 7's threshold requirement, which attack the Court has already rejected. Next, Plaintiff argues that I&A's redactions are "overbroad," while citing only one example of a redaction that Plaintiff supposes to withhold I&A's "analysis of the activities of persons aspiring to travel"; this information, in Plaintiff's estimation, does not constitute guidelines or techniques and procedures of law enforcement. (*Id.* (citing to Price Decl., Ex. 12 at 1)). Even assuming Plaintiff's surmise as to the content of the redacted material to be correct, its legal conclusion — that such travel trends could not constitute law enforcement guidelines — is not: By focusing on historical travel trends of suspected extremists, I&A is able to focus its future policies toward identifying criminal suspects in the future. This falls within the definition of law enforcement "guidelines" for the purpose of Exemption 7(E). *See, e.g.*, *N.Y. Times Co.* v. *U.S. Secret Serv.*, No. 17 Civ. 1885 (PAC), 2018 WL 722420, at *7 (S.D.N.Y. Feb. 5, 2018) (holding that Secret Service's documents involving historical staffing for presidential candidate protection was a "guideline for future conduct" because they "would lead to dissemination of information about future … operations"). I&A's withholdings under Exemption 7(E) were thus proper.

### c. I&A's Withholdings Pursuant to Exemption 7(D) Were Proper

As previously mentioned, Exemption 7(D) shields from disclosure information that "could reasonably be expected to disclose the identity of a confidential source," including "in the case of a record or information compiled … by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source[.]" 5 U.S.C. § 552(7)(D). "Under Exemption 7(D), the question is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *U.S. Dep't of Justice* v. *Landano*, 508 U.S. 165, 172 (1993).

Pursuant to Exemption 7(D), I&A withheld information within an intelligence assessment entitled *Syria-Based US and UK Persons' Public Social Media Activity Effective but Provides Terrorism Prevention Opportunities*. (Sepeta Decl., Ex. A). The information withheld consists of "information on social media use to assist counterterrorism and law enforcement officials in understanding the threat posed by Syria-based foreign fighters and US-based extremists, with the understanding that its identity would not be revealed." (Sepeta Decl. ¶ 30). Disclosure of this information, I&A contends, would reveal "the confidential source's identity and the information the source provided[.]" (*Id.*).

Plaintiff's sole challenge to I&A's withholdings under Exemption 7(D) is its contention that some of the information withheld "does not appear to be

protection of a source or of information the source provided." (Pl. Br. 23). But accepting this argument — which cites as an example a single redaction that Plaintiff speculates "is a conclusion, not information that would reveal a government source" (*id.*) — would require the Court to discredit the declaration that I&A has submitted in support of its redactions. Without a showing of bad faith, which Plaintiff has not so much as suggested, the Court may not so discredit I&A's supporting declaration, which provides with reasonable specificity the contours of the information withheld and the risks attendant to its disclosure. *See Cuomo*, 166 F.3d at 478. Accordingly, I&A's redactions pursuant to Exemption 7(D) were proper.

## CONCLUSION

As noted, the Court is lifting the stay in order to address the parties' cross-motions. For the reasons stated in this Opinion, the Government's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     August 3, 2018
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge